UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

NICOLE CARUSO,

                    Plaintiff,

          v.

BALLY'S ATLANTIC CITY a/k/a
CAESARS ENTERTAINMENT CORP.,

                    Defendant.

HONORABLE NOEL L. HILLMAN

Civil Action
No. 16-05021 (NLH/KMW)

**OPINION**

APPEARANCES

David Mikel Koller
KOLLER LAW LLC
2043 Locust Street
Suite 1B
Philadelphia, PA 19103
     Attorney for Plaintiff

Amy Elizabeth Rudley
Russell L. Lichtenstein
Justin A. Britton
COOPER LEVENSON, P.A.
1125 Atlantic Avenue
Third Floor
Atlantic City, NJ 08401
     Attorneys for Defendant

**HILLMAN, District Judge:**

## I.    INTRODUCTION

The Family Medical Leave Act (hereinafter "FMLA"), 29

U.S.C. § 2601, allows employees to take up to twelve weeks of

medical leave in a year without losing their jobs and prohibits employers from interfering with an employee's FMLA rights. In this case, Plaintiff Nicole Caruso (hereinafter "Plaintiff"), who was employed by Defendant Bally's Atlantic City (hereinafter "Defendant") as a bartender, alleges that Defendant violated her rights under the FMLA and under the New Jersey Family Leave Act (hereinafter "NJFLA") when it terminated her on February 9, 2016 and May 30, 2017, both occurring shortly after she missed work, due to migraine headaches.

Presently before the Court is Defendant's motion for summary judgment [Docket Item 45], which challenges all Counts of Plaintiff's Amended Complaint [Docket Item 22]. Plaintiff opposes the motion. (See Pl.'s Opp'n [Docket Item 49].) For the reasons set forth below, the Court will deny Defendant's motion for summary judgment as to Counts 1 and 2 and grant Defendant's motion for summary judgment as to Count 3. Plaintiff's NJFLA retaliation claim will be dismissed.

## II. BACKGROUND

### A. The Family Medical Leave Act

Congress passed the FMLA in 1993 in an attempt "to balance the demands of the workplace with the needs of families." 29 U.S.C. § 2601(b)(1). The FMLA allows "employees to take reasonable leave for medical reasons." Id. at § 2601(b)(2). However, it also requires that all such leave be taken "in a

manner that accommodates the legitimate interests of employers."
Id. at § 2601(b)(3).

FMLA-eligible employees are allowed to take twelve weeks of leave during any twelve-month period. Leave is covered under the FMLA if an employee has a "serious health condition that makes the employee unable to perform the functions" of his or her job. Id. at § 2612(a)(1)(D). Following this period of leave, an employee is entitled to be restored to his or her original position or its equivalent. Id. at § 2614(a)(1).

The FMLA allows for "intermittent leave," defined as "leave taken in separate blocks of time due to a single qualifying reason," when medically necessary. 29 C.F.R. § 825.202(a). Federal regulations note that intermittent leave "may include leave of periods from an hour or more to several weeks." Id. at § 825.202(b)(1). Examples of intermittent leave may include leave taken for medical appointments or for regular medical treatments. Id.

Under the FMLA, employers may not deny leave to employees who qualify, nor may they retaliate against employees who exercise their rights under the FMLA. 29 U.S.C. § 2615.

### B. Factual Background

Plaintiff Nicole Caruso was hired by Defendant Bally's Atlantic City as a bartender in or around the Spring of 2010. (See Am. Compl. [Docket Item 22], ¶ 13; see also Answer to Am.

Compl. [Docket Item 26], ¶ 13.) She suffered from migraines during her employment with Defendant. (Am. Compl. [Docket Item 22], ¶ 15.) By January 2016, Plaintiff's condition had escalated to the point that she needed to take time off from work. (Id. at ¶ 16.)

The same month, Ashley Joas (hereinafter "Joas"), a manager for Defendant issued Plaintiff three separate disciplinary actions. (Joas Dep., Pl's Ex. B [Docket Item 49-4], 89:19-22.) Aware that Plaintiff was on FMLA leave, Joas issued Plaintiff a write-up for using obscene language and creating an unhealthy workplace environment, (id. at 77:12-18), for using her cell phone at work, (id. at 81:17-23), and for failing to use appropriate language and tone while addressing her managers. (Id. at 85:25-86:7.) Plaintiff complained that the separate disciplinary actions were excessive and Joe Procopio, a labor relations representative for Defendant, informed Joas that she should have issued a single write-up that addressed all of Plaintiff's misconduct. (Id. at 90:23-25, 93:4-6.) Joas testified that she issued each discipline separately "to make sure that each one was clear" but "could have put them all into one document." (Id. at 89:16-18.) Joas told Procopio that she would comply with his instruction in the future. (Id. at 93:7.)

On January 12, 2016, Plaintiff took FMLA leave in response to her migraines and subsequently applied for intermittent leave

pursuant to the FMLA. (Am. Compl. [Docket Item 22], ¶¶ 17–18.) In late January, Defendant notified Plaintiff that her request was approved through December 26, 2016. (Id. at ¶ 19.)

Plaintiff returned to work from her initial period of FMLA leave on February 2, 2016. (Id. at ¶ 21.) Plaintiff alleges that, during a shift on February 5, 2016, after invoking her intermittent FMLA leave, Joas stated to Plaintiff: "You just can't up and leave anytime you want because of FMLA." (Id. at ¶ 23.) Plaintiff testified in her deposition that, before ending her shift for that night, and noticing that sour mix was "curling in [an alcoholic] drink" that she had made, Plaintiff suspected that the mix had gone bad. (Pl.'s Dep., Def.'s Ex. A [Docket Item 45-1], 81:15–82:21.) Plaintiff then transferred the drink from a glass container into a plastic cup, assertedly in order to alert her manager about the spoiled mix. (Pl.'s Dep., Ex. A [Docket Item 35-1], 85:17–19, 95:4–8.)[1] Plaintiff placed the cup in the back bar, but a manager had not been informed of the expired sour mix until after Plaintiff was suspended. (Id. at 95:4–10.)

---

[1] Defendant also provided four hours of surveillance video recordings in support of its motion for summary judgment, in a CD referred to as "Exhibit B." As the video is not necessary to decide the present motion, and as Defendant refers only generally to the four hours of video, without providing the Court with a specific timestamp containing allegedly relevant evidence Court will not refer to the video further in this opinion.

Another bartender, Stephanie Mills (hereinafter "Mills"),
notified Joas that Plaintiff "was drinking behind the bar."
(Joas Dep., Pl.'s Ex. B [Docket Item 49-4], 107:13-14.)  Mills,
who may have been required to cover Plaintiff's shifts at times
while Plaintiff utilized FMLA leave, (Edley Dep., Pl.'s Ex. A
[Docket Item 49-4], 45:16-18), did not get along with Plaintiff.
(Joas Dep., Pl.'s Ex. B [Docket Item 49-4], 25:23-26:3.)  Joas
examined the cup and, realizing that the drink was a specialty
cocktail, took a sample of it in another cup and delivered it to
her direct supervisor, Jerry Beaver.  (Id. at 107:15-19.)
Plaintiff acknowledges that, to confirm her suspicions about the
sour mix, she took a sip of the drink from the plastic cup.
(Pl.'s Dep., Def.'s Ex. A [Docket Item 45-1], 95:11-23.)
Plaintiff claims that she then determined that the drink was
indeed bad and thereafter proceeded to dispose of it down the
sink, which, being off-camera, was not caught in the
surveillance video provided to the Court.  (Id. at 78:23-79:1,
82:21-82:1, 95:13-15.)

Plaintiff testified at her deposition that she was well
aware that employees may and have been fired for drinking on the
job, (Pl.'s Dep., Def.'s Ex. A [Docket Item 45-1], 74:7-12), but
that this was not the case here.  (Id. at 124:17.)  She contends
that her action was "part of the bartender's job" and that
"bartenders take sips of drinks all the time to see if it was

bad." (Id. at 124:19-22.)  However, just as Plaintiff was
getting ready to end her shift early pursuant to her
intermittent FMLA leave, she was approached by members of
Defendant's security team and Jerry Beaver (hereinafter
"Beaver"), Defendant's Director of Food and Beverage.  (Am.
Compl. [Docket Item 22], ¶ 27.)  Beaver informed Plaintiff that
she was being suspended pending investigation for drinking on
the job.  (Id. at ¶ 28.)  Plaintiff alleges that Joas, along
with Stephanie Mills and Randy Panckeri, two of Plaintiff's co-
workers, were tasting tequila during the same shift yet were not
disciplined.  (Id. at ¶ 30-31.)  Defendant denies this
allegation.  (Answer to Am. Compl. [Docket Item 26], ¶ 31.)

        On February 9, 2016, Cori Edley, the Beverage Operations
Manager for Defendant (hereinafter "Edley") called Plaintiff,
notifying her that she had been terminated.  (Am. Compl. [Docket
Item 22], ¶ 33.)  Plaintiff filed a grievance with her union
shortly afterwards.  (Id. at ¶ 35.)  A grievance settlement
agreement was signed on December 14, 2016, (see Grievance
Settlement Agreement, Def.'s Ex. C [Docket Item 45-1]), and
Plaintiff returned to work on or around December 20, 2016.  (Am.
Compl. [Docket Item 22], ¶ 36.)

Subsequently, on May 20, 2017, Plaintiff was working a bartending shift. (Id. at ¶ 37.)[2] Plaintiff claims that only one other bartender, Maya,[3] was scheduled for the shift and that Maya had taken a 45-minute break during the incident in question. (Am. Compl. [Docket Item 22], ¶ 35.) Defendant denies this allegation. (Answer to Am. Compl. [Docket Item 26], ¶ 35.) During Maya's alleged break, a table of six customers sat down to be served. (Am. Compl. [Docket Item 22], ¶ 35.) Plaintiff testified that she was instructed to provide complimentary drinks by the Beverage Manager, John Dougherty (hereinafter "Dougherty"). (Id. at ¶ 41.) Despite the enumerated policies on ringing up items at the bar, (see Check and Cash Handling Procedures, Def.'s Ex. D [Docket Item 45-1]), Plaintiff testified that Dougherty instructed Plaintiff not to ring up the complimentary drinks before the drinks were served, saying that he would "take care of it." (Pl.'s Dep., Pl.'s Ex. C [Docket Item 49-4], 213:23-24.) Plaintiff asserts that the customers who received the complimentary drinks tipped her $40, which she

_____

[2] Based on the chronological flow of the Amended Complaint and on other documents submitted in connection with the present motion, the Court will assume that the shift in question here occurred in May 2017, rather than in May 2016, as stated in the Amended Complaint.

[3] The last name of this individual is not indicated in the record. Therefore, the Court will refer to her simply by her first name: "Maya."

split with a waitress named "Tiffany," who had assisted Plaintiff while Maya was on break. (Am. Compl. [Docket Item 22], ¶ 42-43.)

Plaintiff contends that she utilized her intermittent FMLA leave the next day, May 21, 2017. (Id. at ¶ 44.) She alleges that, on the same day, she received a text message from Dougherty stating, "Stop pulling FMLA on the new girl!!!!!!" (Id. at ¶ 45.) Plaintiff returned to work on May 22 and 23 without issue. (Id. at ¶ 46.) On May 26, Edley summoned Plaintiff to her office where Plaintiff met with Edley and the Shop Steward, Tammy Brennan (hereinafter "Brennan"). (Id. at ¶ 47.) With Defendant's Surveillance Director present, Plaintiff was shown a surveillance video of her May 20, 2017 shift. (Id. at ¶ 51.) Edley then suspended Plaintiff pending an investigation of "some questionable transactions" (Edley Dep., Pl.'s Ex. A [Docket Item 49-4], 117:14.) Edley testified that the delay in addressing the incident was due to not having been notified until after Plaintiff had departed for the night on May 20, as well as "[t]he director of security [being] off Sunday [and] Monday and [Plaintiff]'s days off that week [being] Wednesday [and] Thursday." (Id. at 114:19-24.)

On May 30, 2017, Edley contacted Plaintiff, informing her that she was terminated from employment. (Am. Compl. [Docket Item 22], ¶ 53.) While the termination letter does not specify

the nature of the incidents, (id. at ¶ 55), Defendant has stated

that the termination was due to "various violations of Bally's

policies including those relating to recording transactions and

cash handling." (Answer to Am. Compl. [Docket Item 26], ¶ 52.)

In her deposition, Edley indicated that Plaintiff's alleged

infractions included "[g]iving patrons alcoholic beverages and

not ringing them into the point of sale system, inaccurately

ringing for products given out . . . , [and] giving cans of beer

[that cost] $6.50 and only charging draft prices." (Edley Dep.,

Pl.'s Ex. A [Docket Item 49-4], 119:11-17; see also Incident

Report, Def.'s Ex. E [Docket Item 45-1].) Defendant further

alleges that the $40 "tip" given to Plaintiff was

inappropriately pocketed and "should have been inputted in the

register." (Edley Dep., Pl.'s Ex. A [Docket Item 49-1], 183:16-

18.)

### C. Procedural History

Plaintiff now claims that both of her terminations, in

February 2016 and May 2017, constituted unlawful interference

with her FMLA rights. (Am. Compl. [Docket Item 22], ¶ 57.) She

also contends that she was fired as a form of retaliation for

invoking her FMLA leave, with her alleged violations of company

policy serving as merely a pretext. (Pl.'s Opp'n [Docket Item

50], 19-20.)

Plaintiff filed her Amended Complaint [Docket Item 22], on August 31, 2017.  Count 1 of the Amended Complaint alleges interference with Plaintiff's FMLA rights.  (Am. Compl. [Docket Item 22], ¶ 58-68.)  Count 2 alleges discrimination/retaliation in violation of the FMLA.  (Am. Compl. [Docket Item 22], ¶ 69-80.)  Count 3 claims retaliation in violation of the NJFLA. (Am. Compl. [Docket Item 22], ¶ 81-91.)  Plaintiff seeks all available equitable relief, including reinstatement of job position, full restoration of all leave and health benefits, any additional unpaid leave up to the maximum permitted by the FMLA, and costs related to the instant action against Defendant. Defendant filed an Answer to the Amended Complaint [Docket Item 26], on November 2, 2017.

On September 21, 2018, Defendant filed the instant motion for summary judgment [Docket Item 45].  Plaintiff has filed an opposition brief and Defendant has filed a brief in reply.  The matter is now ripe for review.

**III. JURISDICTION**

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, because Counts 1 and 2 allege violations of a federal statute.  The Court has supplemental jurisdiction over Plaintiff's state-law claim that arises out of the same case or controversy, pursuant to 28 U.S.C. § 1367.

## IV.  STANDARD OF REVIEW

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>accord</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u> at 248.  The non-moving party "need not match, item for item, each piece of evidence proffered by the movant," but must present more than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party.  <u>Boyle v. Cty. of Allegheny</u>, 139 F.3d 386, 393 (3d Cir. 1998) (quoting <u>Anderson</u>, 477 U.S. at 252).

In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, here the plaintiff, and must provide that party the benefit of all reasonable inferences.  <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007); <u>Halsey v. Pfeiffer</u>, 750 F.3d 273, 287 (3d Cir.

2014). However, any such inferences "must flow directly from admissible evidence [,]" because "'an inference based upon [ ] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" <u>Halsey</u>, 750 F.3d at 287 (quoting <u>Robertson v. Allied Signal, Inc.</u>, 914 F.2d 360, 382 n.12 (3d Cir. 1990); citing <u>Anderson</u>, 477 U.S. at 255).

## V.  DISCUSSION

An employer may be sued under the FMLA for interfering with an employee's FMLA rights, as well as for retaliating against an employee who exercises rights under the FMLA. <u>Lupyan v. Corinthian Colleges Inc.</u>, 761 F.3d 314, 318 (3d Cir. 2014). "[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." <u>Erdman v. Nationwide Ins. Co.</u>, 582 F.3d 500, 509 (3d Cir. 2009). Plaintiff asserts both interference and retaliation claims.

### A. FMLA Retaliation

The FMLA prohibits employers from discriminating against employees who have taken FMLA leave, and also prohibits employers from using an employee's utilization of FMLA leave as a negative factor in employment actions, such as hiring, promotion, or disciplinary actions. 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c); <u>see also</u> <u>Hodgens v. Gen. Dynamics Corp</u>., 144 F.3d 151, 159-60 (1st Cir. 1998). To establish a

retaliation claim under the FMLA, a plaintiff must first establish a prima facie case of retaliation by demonstrating that: (1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the plaintiff's FMLA leave. Conoshenti v. Pub. Serv. Elec. & Gas Co._, 364 F.3d 135, 146 (3d Cir. 2004).

Once a prima facie case has been established, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997)). If the defendant is successful in articulating a legitimate, nondiscriminatory reason for the adverse action, the burden then shifts back to the plaintiff, who must show that the employer's proffered reason is only pretext and that the employer's real reason for the adverse action was to retaliate against the employee for taking FMLA leave. Hodgens, 144 F.3d at 161; Thurston v. Cherry Hill Triplex, 941 F.Supp.2d 520, 532 (D.N.J. 2008).

In this case, the parties agree that Plaintiff meets the first two elements of the FMLA retaliation analysis, as "[P]laintiff invoked her right to FLMA-qualifying leave numerous times throughout the course of her employment with [Defendant]"

and "was terminated from her employment with [Defendant]."
(Def.'s Br. [Docket Item 45], 4.)  However, Defendant argues
that Plaintiff fails to make a prima facie case because she
cannot establish causation.  (Id. at 3-4.)  Therefore, the
Court's attention must first turn to the third prong of
Plaintiff's initial burden: whether the adverse action was
causally related to Plaintiff's FMLA leave.

To demonstrate the third prong of her prima facie case,
Plaintiff "must point to evidence sufficient to create an
inference that a causative link exists between her FMLA leave
and her termination."  Lichtenstein v. Univ. of Pittsburgh Med.
Ctr., 691 F.3d 294, 307 (3d Cir. 2012) (citing Farrell v.
Planters Lifesavers Co., 206 F.3d 271, 279-81 (3d Cir. 2000)).
Causation may be shown "through temporal proximity between the
protected activity and the adverse employment action; an
intervening pattern of antagonism; or the evidence taken as a
whole."  Bartos v. MHM Corr. Servs., Inc., 454 F. App'x 74, 78-
79 (3d Cir. 2011) (citing Farrell, 206 F.3d at 280-81; Kachmar
v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)).
When the "temporal proximity" between the protected activity and
adverse action is "unduly suggestive," this "is sufficient
standing alone to create an inference of causality and defeat
summary judgment."  LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,

503 F.3d 217, 232 (3d Cir. 2007) (citing <u>Clark County School</u>
<u>Dist. V. Breeden</u>, 532 U.S. 268, 273-74 (2001)).

Here, Plaintiff was suspended on February 5, 2016, just
three days after returning from FMLA leave, and terminated on
February 9, 2016, only seven days after returning from FMLA
leave. (Am. Compl. [Docket Item 22], ¶ 32-33.) Plaintiff also
requested FMLA leave on the night of the first incident,
February 5, 2016. (Pl.'s Dep., Pl.'s Ex. C [Docket Item 49-4],
84:8-16.) With regards to the second adverse action, Plaintiff
was suspended on May 26, 2017, five days after utilizing her
intermittent FMLA, and then terminated on May 30, 2017. (Am.
Compl. [Docket Item 22], ¶ 53; Pl.'s Opp'n [Docket Item 49],
11.) "'Although there is no bright line rule as to what
constitutes unduly suggestive temporal proximity,' the temporal
proximity in this case is in the realm of what [the Third
Circuit] and others have found sufficient at the prima facie
stage." <u>Lichtenstein</u>, 691 F.3d at 307 (quoting <u>LeBoon</u>, 503 F.3d
at 233) (finding seven days to be unduly suggestive); <u>see</u> <u>also</u>
<u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 708 (3d Cir. 1989) (finding
two days unduly suggestive); <u>Seeger v. Cincinnati Bell Tel. Co.</u>,
681 F.3d 274, 283 (6th Cir. 2012) (three weeks).

Defendant argues that the frequency of Plaintiff's use of
FMLA leave without incident undermines the demonstration of
temporal proximity because "to allow the consideration of

temporal proximity in this particular matter would allow this

plaintiff an inference of FMLA retaliation on every single day,

no matter the circumstances, from 2012 forward." (Def.'s Reply

[Docket Item 52], 2.) But, given the extended length of

Plaintiff's leave from January to February of 2016, just prior

to her first suspension and multiple incidents of discipline

shortly after the protected activity, the Court disagrees. The

need for frequent use of FMLA leave should not deprive a

plaintiff of a path to making a prima facie case for causation.

Indeed, it may well be the repeated use of FMLA leave that

prompts retaliation by some employers who may not retaliate

against an individual use of FMLA leave.

Additionally, Plaintiff was disciplined several days after

receiving a text from her supervisor, Dougherty, instructing her

to "[s]top pulling FMLA" on Plaintiff's new coworker. (Id. at

¶ 45.) The close proximity between Dougherty's disapproval of

Plaintiff's invocation of her FMLA rights and Plaintiff's

termination is unduly suggestive. Therefore, the Court finds

that Plaintiff has established a causal connection between her

taking FMLA leave and the adverse employment actions and, hence,

Plaintiff has established a prima facie case of FMLA

retaliation.

Defendant contends that there was a legitimate,

nondiscriminatory reason for suspending and terminating

Plaintiff in February 2016 and May 2017: Plaintiff had violated company policy by consuming alcohol while on the job and had violated "a number of check processing procedures," respectively. (Def.'s Br. [Docket Item 45], 10.) Plaintiff testified that she was well aware that employees may and have been fired for drinking on the job. (Pl. Dep., Def.'s Ex. A [Docket Item 45-1], 74:7-12.) Moreover, Plaintiff acknowledges certain check procedures that need to be followed while serving drinks. (Id. at 151:19-25.) Firing an employee solely for defying company policy is not unlawful under the FMLA. Thus, Defendant has met its burden of articulating a legitimate, nondiscriminatory reason for terminating Plaintiff.

The Court now addresses whether Plaintiff has shown that Defendant's proffered reason was pretext for FMLA retaliation. To show pretext, Plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably (1) disbelieve the employer's articulated legitimate reason; or (2) believe that retaliatory animus was more likely than not a motivating or determinative cause of the employer's conduct. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); Simpson v. Kay Jewelers, Div. Of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998). Plaintiff need not demonstrate that her FMLA leave was "the sole or most important factor upon which the employer acted," but rather merely "a negative factor in [adverse]

employment actions." <u>Lichtenstein</u>, 691 F.3d at 301 (quoting 29 C.F.R. § 825.220(c)).  Taking all reasonable inferences in the light most favorable to Plaintiff, as the nonmoving party, the Court finds that a reasonable jury could conclude that retaliatory animus was a negative factor contributing to Defendant's adverse employment action against Plaintiff.

With regard to Plaintiff's first suspension and termination, a reasonable "jury could infer intervening antagonism between Plaintiff's assertion of [FMLA] rights and her suspensions and terminations."  (Pl.'s Br. [Docket Item 49], 13.)  During Plaintiff's shift on February 5, 2016, Joas accused Plaintiff of drinking on the job, which led to her termination several days later.  (Joas Dep., Pl.'s Ex. B [Docket Item 49-4], 107:15-19.)  According to Beaver, while Joas was not the sole decision-maker regarding Plaintiff's first termination, "she would have definite input."  (Beaver Dep., Pl.'s Ex. D [Docket Item 49-4], 46:22-23.)  In January 2016, a month before the first termination, Joas had issued Plaintiff three separate disciplinary actions.  (Joas Dep., Pl's Ex. B [Docket Item 49-4], 89:19-22.)  Aware that Plaintiff was on FMLA leave, Joas issued Plaintiff a write-up for using obscene language and creating an unhealthy workplace environment, (<u>id.</u> at 77:12-18), for using her cell phone at work, (<u>id.</u> at 81:17-23), and for

failing to show proper language and tone while addressing management. (Id. at 85:25-86:7.)

Plaintiff complained of the excessive discipline and Joe Procopio, Defendant's labor relations representative, agreed that Joas should have issued a single write-up that addressed all of Plaintiff's misconduct. (Id. at 93:5-7.) A reasonable jury could infer animus from Joas' conduct. Plaintiff further alleges that during her February 5, 2016 shift, Joas told Plaintiff that she "just can't up and leave anytime you want because of FMLA."[4] (Am. Compl. [Docket Item 22], ¶ 23.) Furthermore, Edley, who was a direct decision-maker in Plaintiff's termination in February 2016, "testified that Plaintiff's use of intermittent leave posed an inconvenience for Defendant, because 'in any operation, if an employee has to leave early, it may very well impact the operation.'" (Def.'s Br. [Docket Item 45], 25 (quoting Edley Dep., Pl.'s Ex. A [Docket Item 49-4], 36:17-22).)

A reasonable jury could find that Plaintiff's "misconduct" was an acceptable and routine aspect of any bartender's work or that it was only one factor taken in connection with her utilization of FMLA leave that motivated Defendant's adverse

---

[4] The Court notes that, while asserted in the Amended Complaint, this allegation does not appear in Plaintiff's opposition brief or in her statement of facts.

employment action against Plaintiff. Based on the record, viewed in the light most favorable to Plaintiff, a reasonable jury could conclude that the sip Plaintiff took from the allegedly-spoiled drink served as pretext and that Defendant considered Plaintiff's use of FMLA leave at least as a negative factor in its decision to terminate her.

When viewed in the same light, a reasonable jury could further find that Plaintiff's May 2017 termination was, at least in part, similarly motivated. Edley was also involved in the decision to terminate Plaintiff for the second time. Moreover, on May 21, 2017, in between Plaintiff's alleged policy violations related to mishandled transactions and her termination, Plaintiff claims to have utilized her intermittent FMLA. (Am. Compl. [Docket Item 22], ¶ 44.) That same day, Plaintiff received a text message from Dougherty telling her to "[s]top pulling FMLA on the new girl!!!!!!" (Id. at ¶ 45.) This text message strongly suggests open disapproval of Plaintiff's utilization of FMLA leave.

Defendant argues that this text message "is at best a mere stray comment" because it was sent "in the context of a discussion regarding the seniority list and voluntary days off taken by other employees, as well as the training of the new bartender." (Def.'s Br. [Docket Item 45], 12-13.) Defendant further contends that the text does not preclude the granting of

the motion for summary judgement because "[t]he author of this text was not involved in the decision to terminate the plaintiff and was not aware of the specific details of the termination." (Id.) This Court disagrees with Defendant's reasoning. As established in the above discussion of Joas' role in Plaintiff's first dismissal, "[u]nder our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate." Abramson v. William Patterson Coll. of N.J., 260 F.3d 265, 286 (3d Cir. 2001); see also McKenna v. City of Philadelphia, 649 F.3d 171, 179 (3d Cir. 2011) (holding that "a reasonable jury could conclude that [a supervisor's] animus bore a direct and substantial relation to [the employee's] termination").

Here, in investigating the May 2017 incident that led to Plaintiff's termination, Edley testified that she had "asked [Dougherty] if he had comped any beverages for [Plaintiff] that day, and he said, he did not." (Edley Dep., Pl.'s Ex. A [Docket Item 49-4], 114:6-8.) However, Plaintiff alleges that Dougherty had given such an instruction, telling Plaintiff not to ring up the complimentary drinks, assuring Plaintiff that he would "take care of it when he gets in." (Pl.'s Dep., Pl.'s Ex. C [Docket Item 49-4], 213:23-24.) Given the text message and the totality of the evidence viewed in the light most favorable to the Plaintiff, a reasonable jury could find that Plaintiff's

testimony on the matter is more credible than that of Dougherty or of Edley.

A reasonable jury could further find that Dougherty had instructed Plaintiff not to ring up the drinks and then later misrepresented these events, motivated, at least in part, by his disapproval of Plaintiff's use of FMLA leave. Such a jury could further find that this was a proximate cause of Plaintiff's ultimate termination, reasoning that Plaintiff may not have been disciplined had Dougherty informed Edley of his instruction to Plaintiff. See Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011) (explaining that "[s]ince a supervisor is an agent of the employer, when he causes an adverse employment action the employer causes it; and when discrimination is a motivating factor in his doing so, it is a 'motivating factor in the employer's action'").

Accordingly, Plaintiff has established the requisite pretext to defeat Defendant's motion for summary judgment with regards to Count Two, Plaintiff's FMLA Retaliation claim.

### B. FMLA Interference

29 U.S.C. § 2615(a)(1) of the FMLA prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right" that it guarantees. "Interference" includes "[a]ny violations of the [FMLA] or of these [FMLA] regulations." 29 C.F.R. § 825.220(b).

An interference claim under § 2615(a)(1) is "not about
discrimination, it is only about whether the employer provided
the employee with the entitlements guaranteed by the FMLA."
Callison v. City of Philadelphia, 430 F.3d 117, 120 (3d Cir.
2005).  To prevail on an FMLA interference claim, an employee
need only show that (1) she was entitled to benefits under the
FMLA; and (2) she was denied them.  Lichtenstein, 691 F.3d at
312; Sommer v. The Vanguard Group, 461 F.3d 397, 399 (3d Cir.
2006).  The interference inquiry is merely about whether the
employer provided its employee with the entitlements and
protections guaranteed by the FMLA.  Hodgens v. Gen. Dynamics
Corp., 144 F.3d 151, 159 (1st Cir. 1998).

Here, the parties stipulate that Plaintiff was entitled to
benefits under the FMLA, leaving the Court with the matter of
whether Defendant interfered with Plaintiff's ability to
exercise her FMLA rights.  Defendant contends that Plaintiff is
unable to establish a claim of FLMA interference because she "is
unable to establish that any FMLA benefits were denied to her."
(Def.'s Br. [Docket Item 45], 2.)  Although Defendant did not
deny any of Plaintiff's requests for FMLA leave, except when
Plaintiff's request paperwork was incomplete, (Pl. Dep., Def.'s
Ex. A [Docket Item 45-1], 48:16-49:3.), the Third Circuit has
repeatedly held "that firing an employee for a valid request for
FMLA leave may constitute interference with the employee's FLMA

rights as well as retaliation against the employee." Erdman,
582 F.3d at 509; see also Lichtenstein, 691 F.3d at 312 (holding
that "[b]y terminating [the plaintiff's] employment for having
invoked her right to FMLA leave, [the defendant] unlawfully
interfered with her rights in violation of 29 U.S.C.
§ 2615(a)(1)"). It follows that, for the reasons set forth in
the retaliation analysis above, Plaintiff has met her burden at
this stage in the litigation. Accordingly, Defendant's motion
for summary judgement will be denied with regard to Count One,
Plaintiff's FMLA interference claim.

### C. NJFLA Retaliation

Plaintiff contends in Count Three of her Amended Complaint
that Defendant violated her rights under the NJFLA by suspending
and terminating her twice. Defendant challenges this claim as a
matter of law, asserting that the "[a]ct does not provide any
leave or entitlement for leave as a result of employee's own
health condition." (Def.'s Br. [Docket Item 45], 14.) Rather,
Defendant contends that NJFLA only confers benefits in cases of
a family member's serious health condition or for purposes of
caring for a newly born or adopted child. See NJSA § 34:11B-4
(a) and (b). The Court agrees, finding that Plaintiff's claim
is inapplicable to the statute. Plaintiff had exercised her
right to FMLA leave as a result of Plaintiff's own migraines,
not due to the medical needs of a family member. Plaintiff

fails to address Defendant's argument relating to NJFLA in her opposition brief regarding the present motion. (See generally Pl.'s Br. [Docket Item 45].) Therefore, summary judgment will be granted in favor of Defendant on Count Three, Plaintiff's NJFLA retaliation claim.

## VI. CONCLUSION

For the foregoing reasons, the Court will deny Defendant's motion for summary judgment as to Counts 1 and 2 of Plaintiff's Amended Complaint [Docket Item 22] and grant Defendant's motion for summary judgment as to Count 3. An accompanying Order will be entered.


**September 27, 2019**                          **s/ Noel L. Hillman**
Date                                            NOEL L. HILLMAN
                                                U.S. District Judge

At Camden, New Jersey